UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| SCOTT WILLIAM DAVI,<br><br>Plaintiff,<br><br>vs.<br><br>JESSICA COOK, ASSOSIATE WARDEN AT JAMISON ANEX, IN HER OFFICIAL CAPACITY; MARY CARPENTER, MEDICAL DIRECTOR, IN HER INDIVIDUAL CAPACITY; AARON HAYNES,[1] MEDICAL DIRECTOR, IN HIS OFFICIAL CAPACITY; TROY PONTO, DEPTY WARDEN AT SIOUX FALLS DOC, IN HIS OFFICIAL CAPACITY; ANGELA PECHOUS, UNIT COORDINATOR, IN HER INDIVIDUAL AND OFFICIAL CAPACITY; AND TERESA BITTINGER,[2] IN HER OFFICIAL CAPACITY,<br><br>Defendants. | 4:21-CV-04160-RAL<br><br><br>OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR DISCOVERY AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff Scott William Davi, an inmate at the South Dakota State Penitentiary (SDSP), filed this lawsuit under 42 U.S.C. § 1983. Doc. 1. This Court granted Davi's motion for leave to proceed in forma pauperis, and Davi paid the initial partial filing fee. Doc. 5. Davi filed an

---

[1] Davi's amended complaint included claims against Dr. Mary Carpenter, the former medical director, in her individual and official capacities. Doc. 6 at 2. Federal Rule of Civil Procedure 25(d) provides that "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Dr. Aaron Haynes, the current medical director, is automatically substituted for Dr. Carpenter on Davi's official capacity claims. Fed. R. Civ. P. 25(d).

[2] Davi's amended complaint included claims against Dan Sullivan, the former warden of the SDSP, in his official capacity. See Doc. 10 at 1; Doc. 14 at 1. Teresa Bittinger, the current warden of the SDSP, is automatically substituted for Sullivan on Davi's official capacity claims. Fed. R. Civ. P. 25(d).

amended complaint,[3] Doc. 6, which this Court screened under 28 U.S.C. § 1915A, dismissing it in part and directing service on Defendants Dr. Mary Carpenter, Angela Pechous, Doug Clark,[4] Troy Ponto, and Jessica Cook. Doc. 7 at 14–15. Davi's claims for deliberate indifference to serious medical needs against Dr. Carpenter in her official capacity for injunctive relief and her individual capacity survived § 1915A screening. Id. at 14. Davi's retaliation claims against Pechous in her official capacity for injunctive relief and her individual capacity and against Clark, Ponto, and Cook in only their official capacities for injunctive relief survived § 1915A screening. Id. All other claims against Defendants were dismissed under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b). Id. Dan Sullivan was substituted for Clark under Federal Rule of Civil Procedure 25(d). Doc. 14 at 1.

Defendants have filed a motion for summary judgment arguing that Davi failed to exhaust administrative remedies and that they are entitled to qualified and statutory immunity. Doc. 24. Davi opposed Defendants' motion for summary judgment, Doc. 33, and filed a motion for limited discovery, Doc. 34. Although Davi and Defendants disagree on certain matters, most of those factual differences ultimately are not material, and Defendants are entitled to summary judgment on all but one of the claims. On that claim, this Court will allow Davi to serve interrogatories and requests for production as a means of conducting discovery at this time.

---

[3] Davi's complaint and amended complaint were signed and dated under "penalty of perjury." Doc. 1 at 10; Doc. 6 at 10. "A plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment, and a complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint, 28 U.S.C. § 1746." Roberson v. Hayti Police Dep't, 241 F.3d 992, 994–95 (8th Cir. 2001) (internal citation omitted).
[4] Doug Clark was the acting warden at the SDSP. Doc. 6 at 2.

## FACTUAL BACKGROUND[5]

To place the facts in chronological order, this Court recounts the facts not subject to genuine dispute relating to Claim II first, followed by facts relevant to Claim I.

## I.   Deliberate Indifference towards Serious Medical Needs (Claim II)

Davi has suffered from right knee pain, including locking and popping in his knee, since 2014. Doc. 6 at 5. He claims, among other things, that doctors told him that he needed an MRI but Dr. Carpenter, the then-medical director of the South Dakota Department of Corrections, denied his requests for an MRI. Id. at 2, 5.

In February 2014, Davi was transferred from custody in Illinois to the SDSP. Doc. 36 ¶¶ 25–26. On February 1, 2014, upon Davi's intake to the SDSP, he completed an Admission Medical History and Assessment. Doc. 25-4. Davi reported that he had joint, back, and knee pain among other concerns. Id. at 1. When admitted, Davi was prescribed 500 mg of Naproxen for thirty days to alleviate joint pain. Doc. 25-5; Doc. 27 ¶ 6. On February 11, 2014, Davi was prescribed 400 mg of Lodine, an anti-inflammatory; his prescription of Lodine was to begin after

---

[5] Defendants complied with Rule 56.1(A) of this Court's Local Rules by filing a statement of material facts along with their motion for summary judgment. Doc. 30. Local Rule 56.1(B) required Davi to "respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1(B); see also Fed. R. Civ. P. 56(e)(2) (stating that the court can consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). Davi responded to Defendants' statement of undisputed material facts pursuant to Local Rule 56.1(B). Doc. 35. To ensure that the facts are viewed in the light most favorable to Davi as the non-moving party, this Court draws the facts not only from Defendants' statement of undisputed material facts, but also from Davi's verified amended complaint, exhibits, and other filings pertaining to Defendants' motion for summary judgment. See Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980); Roberson, 241 F.3d at 995 ("[T]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion."); see also McClanahan v. Young, 4:13-CV-04140-RAL, 2016 WL 520983, at *1, 2016 U.S. Dist. LEXIS 13978, at *1–2 (D.S.D. Feb. 5, 2016). This Opinion and Order, of course, makes no findings of fact and sets forth the facts in the light most favorable to Davi, as it must in ruling on Defendants' motion for summary judgment.

his prescription for Naproxen expired on March 1, 2014. Doc. 25-5; Doc. 27 ¶ 7. On May 16, 2014, Health Services provided Davi with a knee support for his right knee. Doc. 25-6.

On June 10, 2014, Davi reported grinding in his right knee. Doc. 25-7 at 1. The following day a radiograph was taken of Davi's right knee; the radiograph revealed no occult bony abnormalities, but there was "[m]ild degenerative changes of medial joint space compartment." Id. at 3. Davi alleges he needed an MRI at that time. Doc. 35 ¶ 63. On August 28, 2014, Davi reported to Health Services that he did not feel that the knee sleeve was supportive enough, and Health Services ordered Davi a Velcro knee brace. Doc. 25-8 at 1–2.

On October 16, 2015, Neurology Associates saw Davi for a complaint of leg weakness. Doc. 25-9 at 1. "The neurologist recommended epidural steroid injections (ESI) and an electromyography (EMG). The EMG did not show any radiculopathy of the right leg." Doc. 27 ¶ 10 (citing Doc. 25-9). Davi disputes that the appointment related to his right knee injury, but he does not dispute that the appointment occurred. Doc. 35 ¶ 65.

On February 11, 2016, Davi was prescribed 100 mg of Gabapentin twice daily for 365 days for pain. Doc. 27 ¶ 11; Doc. 25-10. Davi asserts that the Gabapentin was for back pain, not knee pain, but he does not dispute that Gabapentin was prescribed. Doc. 35 ¶ 66. On March 2, 2016, Davi was provided a knee brace for his right knee. Doc. 25-11.

On October 4, 2016, a verbal order was entered to increase Davi's Gabapentin medication to 300 mg and to replace Davi's right knee sleeve. Doc. 25-12 at 1. From October 10, 2016, through December 15, 2016, Davi did not take his Gabapentin medication in the morning.[6] Doc.

---

[6] Davi alleges that he was not able to make it to morning med pass because the pain he was in at night prevented him from sleeping. Doc. 35 ¶ 68. On April 16, 2019, Davi reported that his Gabapentin did not help with pain, and medical staff increased Davi's Gabapentin prescription to 600 mg twice a day for 365 days. Doc. 25-31 at 3; Doc. 27 ¶ 32. Davi contends that the Gabapentin

25-12 at 2–12; Doc. 27 ¶ 12; Doc. 36 ¶ 42.  On January 3, 2017, Davi was seen at Avera Medical

Group (AMG) Neurosurgery, who discontinued his Gabapentin because of completion of therapy.

Doc. 25-13 at 2.  Davi told the provider at AMG Neurosurgery that the ESI provided him

significant relief, and the provider recommended another injection.  Id.; Doc. 27 ¶ 13.  Davi

received ESI injections on January 24, 2017, and May 16, 2017.  Doc. 25-13 at 4–9.  On April 19,

2017, Davi was prescribed 400 mg of Etodolac twice daily for pain management, and the

prescription for Etodolac was renewed for 240 days on June 22, 2017.  Doc. 25-14; Doc. 27 ¶ 14.

Davi asserts that the ESIs and Etodolac were for back and leg pain, not knee pain, but he does not

dispute that the appointments occurred or ESIs and prescriptions were given.  Doc. 35 ¶¶ 69–70.

On July 7, 2017, Davi was seen by medical staff after he complained that his knee popped

out of place when he was walking a dog.  Doc. 25-15.  Davi informed staff that his knee only hurt

when it moves out of place.  Id. at 2–3.  "Davi was directed to ice his knee four times a day for the

next forty-eight hours, rest, use compression, and elevation, and to return to the clinic if the issue

continues or worsens."  Doc. 27 ¶ 15.  Because of Davi's complaint, AMG Radiology conducted

an x-ray on his knee on July 12, 2017.  Id. ¶ 16; Doc. 25-16.  "It was concluded that there has been

progressive loss of the medial femoral tibial joint space of his right knee, but no evidence of acute

fracture or dislocation."  Doc. 27 ¶ 16 (citing Doc. 25-16 at 1).  A Health Services provider

recommended a steroid injection and eventually a knee replacement, but "[t]he plan at that time

was to proceed with conservative treatment to include injections to delay surgery as long as

possible, and to continue with Lodine (Etodolac) and ice when necessary."  Id. (citing Doc. 25-16

at 5).

---

was for his wrist, not his knee, but he does not dispute that his prescription was increased.  Doc.
35 ¶ 85.

On August 25, 2017, Davi went to Health Services for a knee injection and asked if the injection would prevent his knee from popping out because he only has pain when his knee pops out. Doc. 25-16 at 7. When his provider informed him that the injection would not prevent his knee from popping out, Davi stated that the injection was only necessary if his knee pops out. Id. Davi was provided a new knee brace and advised to follow up if his symptoms do not improve with the new brace. Id. at 8.

On September 11, 2017, Davi submitted a kite about knee replacement, injections, and his knee popping out. Doc. 25-17 at 1. Davi also requested an MRI. Id. On September 18, 2017, Davi was seen by Health Services, and the provider requested an MRI on Davi's right knee. Id. at 4, 6. On September 27, 2017, Davi underwent an MRI at Avera McKennan Hospital. Doc. 25-18. The MRI showed the following abnormalities:

> 1) Suspect there has been previous partial medial meniscectomy. Very little intact medial meniscus tissue remaining with much of the remaining meniscal tissue torn with a complex macerated tear, and mild extrusion of the midbody remaining of the medial meniscus; 2) horizontal tear of the posterior horn and body of the lateral meniscus; 3) Small knee joint effusion with nonspecific synovitis, probably reactive; 4) Probable enchondroma centered in the distal femur metaphysis with no definite aggressive characteristics; 5) Tendinopathy and longitudinal split tearing of the proximal popliteus tendon; 6) Severe medial femoral tibial and mild patellofemoral compartment degenerative changes with cartilage defects as above; 7) Probable intra-articular body posterior to the PCL; and 8) Chronic ACL tear scarred into the PCL.

Doc. 27 ¶ 19 (citing Doc. 25-18 at 2). Because of the findings, Health Services consulted with an orthopedic surgeon for further evaluation and treatment. Doc. 25-18 at 5.

On November 7, 2017, Davi went to Health Services for joint pains; Davi was recommended to follow work restrictions, but he signed a Release of Responsibility for his refusal to comply with work restrictions. Doc. 27 ¶ 20. Davi denies that he signed a Release of Responsibility, but Defendants provided a copy of a Release of Responsibility for work restrictions

signed by Davi on November 7, 2017. Doc. 25-19 at 8; Doc. 35 ¶ 76. On November 8, 2017, Davi was seen at AMG Orthopedics and Sports Medicine. Doc. 27 ¶ 21. Upon examining Davi's right knee, the provider stated, "Ultimately, the only 'fix' for this problem is to do a partial knee replacement. However, conservative management should be initially utilized to help with pain control." Doc. 25-20 at 4. The provider "discussed cortisone injection, hyaluronic acid injection, bracing, [and] platelet rich plasma injection." Id. Davi claims Health Services denied his requests for platelet rich plasma injections. Doc. 35 ¶ 78; Doc. 36 ¶ 31. The provider gave Davi a corticosteroid injection, provided follow-up instructions, and "recommended the patient be placed in a brace that will offload the medial compartment. This should include structural support to shift more weight to the lateral side of the knee where he has healthy cartilage and off the medial side where it is more degenerated." Doc. 25-20 at 4. Davi was later fitted for a new knee brace, with which he was pleased. Doc. 25-21.

On November 26, 2018, Davi requested and received renewal of his medications for 325 mg of Tylenol three times daily for 720 days and 400 mg of Etodolac twice daily for 240 days. Doc. 25-25. Davi was seen on January 8 and 9, 2019, after he submitted a kite about knee pain. Doc. 25-27. The provider recommended Davi follow up with the orthopedic surgeon. Doc. 25-27 at 8. On February 27, 2019, a provider at AMG Orthopedics and Sports Medicine saw Davi and diagnosed medial and patellofemoral osteoarthritis, recommending physical therapy and an injection in the joint to help with pain and inflammation. Doc. 25-28 at 4.

On March 26, 2019, Davi started physical therapy. Doc. 25-29. "Davi stated he was in minimal pain and could walk independently and his flexion was within functional limits. Mr. Davi was instructed to return to physical therapy twice a week for four to six weeks." Doc. 27 ¶ 30 (internal citations omitted). Davi attended physical therapy on March 26, 2019; April 16, 2019;

April 18, 2019; April 23, 2019; April 25, 2019; April 30, 2019; May 2, 2019; May 7, 2019; May 9, 2019; May 14, 2019; and May 24, 2019. Id. ¶ 33 (citing Docs. 25-29, 25-32). Davi refused to attend his last physical therapy session on May 16, 2019, because he had "dog duty" as part of his work at SDSP. Doc. 25-32 at 10. "Because Mr. Davi failed to attend his last session, the physical therapist could not do any formal final assessment on his right knee." Doc. 27 ¶ 33 (citing Doc. 25-32 at 10). When Davi was discharged from physical therapy, "the physical therapist acknowledged that Mr. Davi had improved his range of motion, but continued to have pain in his right knee, and that he should continue with home exercise." Id. (citing Doc. 25-32 at 12).

On August 28, 2019, Davi was seen at AMG Orthopedics and Sports Medicine; "[t]he physician recommended that Mr. Davi either have regenerative medicine with platelet rich plasma injections or a referral to Orthopedics for ACL reconstruction versus knee replacement surgery." Doc. 27 ¶ 34 (citing Doc. 25-33 at 1). On September 18, 2019, Davi returned to AMG Orthopedics and Sports Medicine, where he reported that a seventy-pound dog ran into him several weeks ago; Davi received an injection. Doc. 25-34 at 7, 9. Davi indicated that he would like total knee arthroplasty on his right knee, but the provider told Davi to optimize his left knee functioning first. Id. ¶ 35; Doc. 25-34 at 9. On October 16, 2019, Davi was seen at AMG Orthopedics and Sports Medicine and reported his knee pain as a one-out-of-ten with instability. Doc. 25-35 at 1. "Due to the fact that Mr. Davi failed extensive conservative treatment, and total knee arthroplasty was recommended, Mr. Davi elected to proceed with scheduling surgery for a right total knee arthroplasty." Doc. 27 ¶ 36 (citing Doc. 25-35 at 5).

Davi was seen at Health Services on November 7, 2019, because his knee buckled, and he hit his shoulder or back of his arm on the desk or the floor. Doc. 25-36 at 1. Davi was not taking

8

his Etodolac and Gabapentin in the mornings and was advised to rest, to apply ice and compression, and to elevate his shoulder. Id. at 3.

On November 26, 2019, Davi underwent a total right knee arthroplasty. Doc. 27 ¶ 38; Doc. 25-37. On November 27, 2019, Davi returned to the Jameson Prison Annex and was directed to ice his knee for twenty minutes three-to-four times a day and was recommended to use a wheelchair for fourteen days. Doc. 25-38 at 1–2. The normal procedure after surgery was to admit an inmate to the infirmary, but Davi declined and signed a Release of Refusal. Id. at 3.

When Davi returned from the hospital to the SDSP, he was not transported in a wheelchair accessible van and was in discomfort from how the officers transported him. Id.; Doc. 27 ¶ 40; Doc. 36 ¶ 34. Davi completed his assigned stretches and the pain subsided after a nerve block procedure on November 30, 2019. Doc. 25-39; Doc. 27 ¶ 40; Doc. 36 ¶ 36. The treating physician instructed to give Davi a couple of extra pillows to elevate his leg. Doc. 25-39 at 1.

Davi began physical therapy on December 3, 2019. Doc. 25-40 at 1. Davi reported to the physical therapist that officers injured him post-surgery when lifting him into a transport van, but the therapist told Davi that "would not have injured him as the knee is solid." Id. Davi attended physical therapy on December 5, 2019; December 10, 2019; December 17, 2019; December 19, 2019; December 31, 2019; January 2, 2020; January 7, 2020; January 9, 2020; January 14, 2020; January 16, 2020; January 21, 2020; January 23, 2020; and January 28, 2020. Id. at 3–20. Davi was discharged from physical therapy because all short term goals had been met. Id. at 21. Davi does not contest that he received physical therapy, but complains about getting physical therapy only two times a week rather than three times a week as recommended. Doc. 35 ¶¶ 101–102, 104–105, 111, 113–114, 122; Doc. 36 ¶ 32.

On December 9, 2019, Davi was seen at AMG Orthopedics and Sports Medicine for his two-week post-operation. Doc. 25-41 at 1. X-rays showed that Davi's knee was in a satisfactory position. Id. at 5. Davi was recommended to continue therapy for strengthening and range of motion. Id. On December 13, 2019, Davi spoke with Ponto about inadequate pain control. Doc. 25-42 at 1. Davi was taking Tramadol three times a day, instead of the four allowed, because he was to try to wean off the pain medication, but Health Services told him that he should be taking Tramadol every six hours if his pain was not under control. Id.

On December 30, 2019, Davi was seen at AMG Orthopedics and Sports Medicine for a six-week post-surgery evaluation. Doc. 25-43. Davi was doing fairly well and was able to bear weight on his knee, but his knee felt like it wanted to give out when he would stand for longer periods of time. Id. at 4. On January 7, 2020, Ponto called Health Services requesting that Davi have access to a wheelchair until his next appointment, and an order was placed for Davi to have access to a wheelchair until January 14, 2020. Doc. 25-44 at 1. Davi does not dispute that Ponto helped him to obtain a wheelchair, but Davi claims that he had to go to Ponto because Health Servies denied his request for a wheelchair despite knowing that his balance was unstable. Doc. 35 ¶ 111. On January 13, 2020, Davi was seen at AMG Orthopedics and Sports Medicine for his eight-week post-surgery evaluation. Doc. 25-45. Davi reported doing well since surgery despite occasional sensations of instability. Id. at 5. The provider released Davi to return to full duty working with the dogs and recommended ice as needed for pain and swelling for thirty days, Tylenol for pain relief, and continuing physical therapy. Id.

Davi was seen at AMG Orthopedics and Sports Medicine for a one-year post-operative appointment. Doc. 25-46. Davi was not experiencing pain but had some achiness in his knee. Id. at 2, 4. Davi requested other options for shoes and was recommended to receive supportive shoes,

10

such as New Balance. Id. at 5. Davi was seen at AMG Orthopedics and Sports Medicine for his two-year post-surgery evaluation. Doc. 25-47. Davi was doing well and bearing weight without assistive devices and was recommended to continue to wear supporting shoes. Id. at 1–2. On these facts, Davi alleges deliberate indifference to his serious medical needs.

## II.    Retaliation (Claim I)

Davi also alleges that prison staff have retaliated against him for filing grievances and talking about suing prison staff by refusing to allow him to file a formal resolution, lowering his pay, removing him from his prison job, and transferring him to a different housing area. Doc. 6 at 6–9; Doc. 1-1 at 11–18. On January 10, 2020, Davi filed informal resolution request #30723 about his recovery after his knee surgery, and Health Services answered the request. Doc. 26 ¶ 5. According to Davi, Unit Coordinator Angela Pechous "screemed [sic] and yelled about how she paid for [his] surgery and that they owned [him] and could do whatever they wanted, that they didn't have to do anything that the surgen [sic] had ordered[.]" Doc. 6 at 6. See also Doc. 36 ¶ 3. Pechous responds that she "did not ever make any of those comments. There were no conversations between Davi and [her] regarding any of his medical issues." Doc. 26 ¶ 4.

Regardless, Davi received a response on his informal resolution request #30723. Doc. 6 at 6. Davi then asked Pechous for a Formal Resolution, but, Davi claims, she refused and walked away. Id.; Doc. 36 ¶ 4. Davi reported Pechous to Associate Warden Troy Ponto. Doc. 26 ¶ 6. Pechous says that she was not aware that Davi spoke to Ponto about her until Davi told her he had. Id. Davi counters that Pechous was aware that he had spoken to Ponto about her because she was the one who mentioned it to him. Doc. 35 ¶ 20; Doc. 36 ¶ 11. Ponto has no recollection of Davi talking to him about Pechous refusing to file his administrative remedy. Doc. 29 ¶ 5. Regardless of who remembers these encounters correctly, Davi filed an administrative remedy on Pechous for

her refusal to give him a form once she was rotated to another floor. Id. Pechous denies refusing to let Davi file a formal resolution because she does not benefit from withholding grievance forms. Doc. 26 ¶ 7.

Davi had worked as a dog trainer at the SDSP in a program through the Humane Society. Id. ¶ 9. Dog trainers at SDSP wore green shirts, which allowed the inmate access to the whole SDSP facility. Doc. 26 ¶ 10. Inmates who wear red shirts were not allowed access to the whole facility. Id. ¶ 11. After the Humane Society program shut down during Covid-19, Davi continued to wear his green shirt apparently without authorization. Id. ¶ 12. Davi blames Pechous as the one responsible for giving and taking away green shirts. Doc. 35 ¶ 25 (citing Doc. 36 ¶ 10). At any rate, Davi's green shirt was taken away, and he was provided a red shirt until the dogs returned. Doc. 26 ¶ 12.

While the dogs were away from the SDSP, Davi was assigned another job at SDSP bleaching doors. Id. ¶ 13; Doc. 36 ¶ 19. Davi recalls that Unit Manager Bieber asked him if he was working nights bleaching doors, and when Davi responded no, Davi believes that Bieber went to Pechous to get Davi evening hours. Doc. 36 ¶ 19. Pechous however avers that "[a]ll the bleachers have the same hours at the Jameson Annex and are paid the same." Doc. 26 ¶ 22. Davi disputes that all bleachers have the same hours and claims that he was given additional hours bleaching doors at night by Bieber. Doc. 35 ¶ 40; Doc. 36 ¶ 19. Davi claims, and Pechous denies, that around April 10, 2020, Davi was paid half of what he was entitled to for the month of March. Doc. 26 ¶ 13. Pechous claims that the decrease in pay was because of reduction of Davi's work hours with the dog program suspended. Id. ¶¶ 13, 22. But Davi claims that he was not paid for his evening bleaching hours as retaliation for his grievance. Doc. 36 ¶ 19.

Davi's first writeup concerning his work handling dogs was on July 2, 2019, when he was written up for taking a dog in an out-of-bounds area and walking the dog without a leash. Id. ¶ 16; Doc. 36 ¶ 16. The writeup was reduced to a minor infraction, and he was told to ask an officer before he went out of bounds to clean up after a dog. Doc. 36 ¶ 16.

Davi filed his grievance on January 10, 2020, and believes he received writeups thereafter in retaliation. Id. In May 2020, an officer complained that Davi was letting the dogs go out to the yard to relieve themselves. Doc. 1-1 at 14. Davi did not receive a writeup in May 2020. Doc. 29 ¶¶ 16–17, 19.

In June 2020, Davi heard from Officer Angela Bell that Pechous had told Officer Benjamin Moore "that Davi cannot let the dogs pee in the shower and to not tell him about it, that he should just write-him up and she would take his Job." Id. ¶ 8. Pechous responds to this hearsay by explaining that "[a] correctional officer came up to [her] and told [her] that a dog urinated in the shower. [She] informed the correctional officer that if he sees it, [she] will address it. [She] did not talk to Davi about dogs urinating in the shower." Doc. 26 ¶ 15. On July 26, 2020, an informational was submitted, which stated that "this individual . . . has been allowing the dog to use the D-Floor shower to go to the bathroom[.]" Id. ¶ 16 (citing Doc. 25-2). An informational is not a sanction. Id. An informational is given to the inmate to let them know about prohibited actions, but Davi claims that he never received a copy of the informational. Id.; Doc. 36 ¶ 6. Despite not seeing the informational, Davi asserts that it says the reporting officer would " 'go over and above her job' to get Davi fired[;]" Ponto's affidavit debunks this assertion. Doc. 29 ¶ 18. See also Doc. 1-1 at 15.

In June 2020, Davi claims that he was further retaliated against when Officer Bruscher falsely reported him for body slamming a dog into the ground. Doc. 1-1 at 15; Doc. 36 ¶ 16. The

alleged abuse was investigated. Doc. 26 ¶ 18. Davi was not written up or issued an informational based on the accusation. Id. Davi claims that another informational was written about him because he asked to let a dog off the yard when it was 100 degrees outside. Doc. 1-1 at 15; Doc. 25-2 at 1. The informational stated that the dog was outside for an hour-and-a-half and Davi had not filled up the dog's water bowl, but Davi "was hot and wanted to go in and used having the dog as a reason to head in early." Doc. 25-2 at 1. Davi disputes the informational because "the Humane Society Rules . . . state that a dog should NOT be outside in the heat for any longer then [sic] half an hour[.]" Doc. 36 ¶ 17. Davi claims that he was trying to "follow the Humane Society rules by asking to take the dog off the yard out of the heat, there had never been an issue getting dogs off the yard for any reasons that may have been needed except with Officer Knudson after the problems with Coordinator Pechous." Id. Again, an informational is not a sanction. Doc. 26 ¶ 16.

On August 13, 2020, Davi claims that he was written up after Pechous told him to leave a dog with another inmate when Davi was called to physical therapy. Doc. 1-1 at 16. Pechous does not recall this occurrence, "but Davi would have had to come ask [her] if that was permissible." Doc. 26 ¶ 20. See also Doc. 35 ¶ 36. On August 13, 2020, Davi was also written up for walking a dog without its gentle leader. Doc. 29 ¶ 19 (citing 25-3). "He was written up for that on August 13, 2020, however, he only received a verbal reprimand, and was not sanctioned." Doc. 26 ¶ 20 (citing Doc. 25-3).

In February 2021, Davi was called to laundry to ask why he was not coming to work. Doc. 1-1 at 18. Davi blames Pechous for not telling him that he was hired in laundry. Id. However, it is "the coordinator for the laundry unit [who] would send a list of 3-5 people that he's looking for more laundry workers." Doc. 26 ¶ 23. And Pechous did not hire people at the laundry unit or determine how many hours he worked in the laundry unit. Id. Despite Davi believing Pechous

14

was trying to get him fired in the laundry unit, Davi worked in the laundry unit until his transfer to the Hill. Doc. 35 ¶ 42.

On March 17, 2021, Davi was informed that the next week he would be transferred from the Jameson Annex to the Hill.[7] Doc. 1-1 at 18. He claims that the transfer was part of the retaliation from Pechous that began after he filed a grievance on January 10, 2020, because the transfer resulted in worse living conditions and prevented him from working with the dogs. Id. at 22. Pechous disclaims any role in his transfer. Doc. 26 ¶ 24. Regardless, now housed at the Hill, "Davi is currently employed as a dog walker, and he runs the doggy day care program." Id. ¶ 25; Doc. 36 ¶ 20. Davi actually was transferred to the Hill to have more access to jobs and opportunities, something which he acknowledges to exist there. Doc. 28 ¶¶ 10–12; Doc. 35 ¶ 49. Davi had demonstrated good behavior, and Cook did not think he would be a threat at the Hill. Doc. 28 ¶ 9. The reason for the transfer was not retaliation. Doc. 29 ¶ 27. Davi feared that transferring him would pose a threat to his safety, but he did not bring that claim up to Ponto. Doc. 6 at 8–9; Doc. 29 ¶ 28. As of the time Defendants filed their motion for summary judgment, there have been no issues of Davi being threatened or unsafe at the Hill. Doc. 29 ¶¶ 29–30.

---

[7] The "Hill" is colloquial for the older building on the SDSP grounds. The Jaminson Annex is a newer and more secure building containing administrative segregation and death row among other tiers of prison housing. Davi was originally housed at the Jameson Annex because he was classified as "high-medium." Doc. 28 ¶ 5. He was placed in the Jameson Annex to monitor him once he returned from a penitentiary in Illinois after he was involved in an alleged conspiracy to kidnap a family member of former South Dakota Governor Bill Janklow. Doc. 29 ¶ 25. At the time Davi was transferred, he claims that his classification did not change as he was classified as high-medium both before and after the transfer. Doc. 36 ¶ 21. Davi is serving a life sentence for the murder of his ex-wife as well as burglary and rape convictions related thereto. See State v. Davi, 504 N.W.2d 844 (S.D. 1993).

## DISCUSSION

### I.    Davi's Motion for Limited Discovery

Davi filed a motion for limited discovery.  Doc. 34.  His motion cites to Federal Rule of Civil Procedure 56(c)(4) and (d).  Id. at 1.  Rule 56(c)(4) states that a party can support an allegation of an undisputed fact with an affidavit that "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Rule 56(d) states that if a nonmovant shows through affidavit that "for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

Davi requested addresses for Former Officers Angela Bell and Benjamine Moore to obtain an affidavit.  Doc. 34 at 2.  He also requested all information related to him and his dog job, his disciplinary history, work history, job identification, and wages earned per month.  Id. at 2–3.  He claims that "the information requested does have a direct bearing [on] the material facts in response to Defendants['] motion for summary Judgment[.]"  Id. at 3.  Davi filed an affidavit, Doc. 36, and a sworn affidavit, Doc. 37, both of which are under penalty of perjury, alleging his version of facts, including his account of actual and perceived retaliation.  Doc. 24.  Davi as an inmate lacks information internal to SDSP on, for instance, why his earnings declined at one point.  While addresses of former officers Bell and Moore are not necessary, this Court will allow Davi to serve interrogatories and requests for production for him to receive all available information relating to his work and disciplinary history from 2019 forward as well as his wages earned and calculation thereof, and to see whether anything in those records suggests a retaliatory motive by anyone at SDSP.  Thus, Davi's motion for limited discovery, Doc. 34, is granted in part.

## II.   Defendants' Motion for Summary Judgment

### A.   Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party[.]" True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (citation omitted).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine . . . " RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 401 (8th Cir. 1995).  There is a genuine issue of material fact if "a reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011).  A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).  "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

### B.   Standard for Section 1983 Liability

Davi sued Defendants under 42 U.S.C. § 1983 seeking monetary damages and injunctive relief. Doc. 6. Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. State officials sued in their individual capacities for monetary damages under § 1983 may be entitled to qualified immunity as a defense.  Qualified immunity

17

"shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014) (citation omitted). To determine whether a government official is entitled to qualified immunity, the court considers (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). The court may consider the elements in any order, and if either of the elements is not met, then the official is entitled to qualified immunity. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Davi cannot recover monetary damages from Defendants in their individual capacities if Defendants are entitled to qualified immunity.

State officials sued in their official capacities, however, may be sued under § 1983 for injunctive relief, and "[q]ualified immunity does not apply to a claim for injunctive relief." Hamner v. Burls, 937 F.3d 1171, 1175 (8th Cir. 2019).

### C.     Retaliation (Claim I)

#### 1.     Individual Capacity Claims Against Pechous

To demonstrate retaliation in violation of the First Amendment under 42 U.S.C. § 1983, Davi must "show (1) that he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Spencer v. Jackson Cnty., 738 F.3d 907, 911 (8th Cir. 2013) (quoting Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)). The retaliatory conduct itself need not be unconstitutional; "the violation is acting in retaliation for the 'exercise of a constitutionally protected right.' " Id.

18

(quoting Cody v. Weber, 256 F.3d 764, 771 (8th Cir. 2001)). "[A]n act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper." Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990) (internal quotation omitted). Whether there is a causal connection between the protected activity and adverse action is generally a jury question. Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012).

"The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007). Davi alleges that the retaliation began after he filed a grievance about the lack of medical care for his knee. Doc. 6 at 6. Davi also claims that he was retaliated against after he talked about suing prison staff. Id. at 6–9. Davi has shown that he engaged in a protected activity. See id.; Spencer, 738 F.3d at 911. Defendants argue that "there have been no retaliation, and Davi did not suffer any injury which would 'chill a person of ordinary firmness from continuing . . . in [the] activity.' " Doc. 25 at 14 (citing Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001)). The question then on the claim against Pechous is whether genuine disputes of material facts exist that Pechous retaliated against Davi and did so in a way to chill a person of ordinary firmness from continuing in the activity of filing grievances and claims.

Davi claims that Pechous failed to give him a formal resolution after he filed a grievance about the lack of medical treatment for his knee and he reported her to Ponto. Doc. 6 at 6. Pechous denies refusing to provide Davi with a grievance form, and Pechous disagrees with Davi's allegations because there was no reason for her to not give him a grievance form. Doc. 26 ¶ 7. The Eighth Circuit has held that "an inmate of ordinary firmness would not be chilled from continuing to seek redress for his grievances because an official responsible for an early step in

19

the BOP process rejects his BP-8 [Informal Resolution] form or fails to provide access to a grievance appeal form." Gonzalez v. Bendt, 971 F.3d 742, 746–47 (8th Cir. 2020). See also Haynes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020) (finding that a one-month delay in filing one grievance was not sufficient to chill a person of ordinary firmness). Although Davi alleges that Pechous denied him the ability to file grievances, Davi has attached as exhibits to his initial complaint copies of grievances filed after January 10, 2020, the date when Davi filed his initial grievance. See Doc. 1-1 at 1, 10; Doc. 26 ¶ 5. Davi claims that another unit coordinator allowed him to file grievances against Pechous once she was moved to another floor.[8] Doc. 36 ¶ 5. Pechous notes that Davi had other opportunities to get grievance forms from other officers. Doc. 26 ¶ 8. Thus, despite the parties' dispute as to whether Pechous at some point refused to provide Davi with a grievance form or was impolite to Davi, Davi obtained, completed, and filed grievance forms, and any possible denial of the form by Pechous does not create a genuine issue of retaliation.

Davi claims that he was retaliated against by threats to transfer him to the Hill and asserts safety concerns with the move. Doc. 6 at 8. Davi was told that the change stemmed from a favorable classification change, but maintains that he has had the same classification for years since he was transferred to South Dakota. Doc. 33 at 11. According to Davi, other inmates with a similar classification were kept at the Jameson Annex because of their jobs. Doc. 6 at 8. In March of 2021, more than a year after his grievance about medical treatment deficiencies, Davi

---

[8] This Court recognized during its screening of Davi's complaint that "assuming at this point Davi's well-pleaded allegations as true, a reasonable inmate of ordinary firmness would not have been able to file a grievance in such a situation, so Davi's failure to exhaust administrative remedies is excused for purposes of initial screening." Doc. 7 at 6. Defendants state in their motion that they "move for summary judgment because Plaintiff Scott William Davi . . . fails to exhaust his administrative remedies[.]" Doc. 24 at 1. But Defendants do not argue in their brief in support of their motion for summary judgment that Davi failed to exhaust administrative remedies. See generally Doc. 25. Thus, Defendants have not made a showing that they are entitled to summary judgment for failure to exhaust.

was transferred to the Hill. Doc. 1-1 at 18; Doc. 28 ¶ 12. Davi acknowledged that there is more access to programs and work at the Hill. Doc. 35 ¶ 42. Indeed, Davi is working with dogs again there. Doc. 26 ¶ 25; Doc. 36 ¶ 20. The transfer away from the Jamison Annex, which has South Dakota's death row and highest security inmates, was not out of retaliation and was meant to be a benefit to Davi. Doc. 28 ¶ 12. "Transfer within the prison, or to another prison, is within the discretion of prison officials." Lyon v. Farrier, 727 F.2d 766, 768 (8th Cir. 1984) (per curiam) (internal citations omitted). Although "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper[,]" Madewell, 909 F.2d at 1206 (internal quotation omitted), there are no genuine issues of material fact that Davi's transfer was retaliatory. Davi's opinions and preferences for a single cell at the Jamison Annex do not give rise to a genuine issue of material fact.

Davi alleges that Pechous retaliated against him regarding his prison employment. Doc. 6 at 6–9. "Adverse actions which may show retaliation include denial of privileges or acts worsening an inmate's working conditions." Spencer, 738 F.3d at 911 (internal citations omitted). Davi claims that Pechous attempted to get him in trouble by telling officers to not notify him of a policy prohibiting dogs from urinating in the shower so she could fire him from the Humane Society Program. Doc. 36 ¶ 8. Pechous denies the allegations, instead claiming that she was notified by a correctional officer that Davi was allowing dogs to urinate in the shower and that an informational was issued, but not a sanction. Doc. 26 ¶ 16. Davi claims that he was written up because he asked to let a dog off the yard when it was 100 degrees, in accordance with Humane Society rules. Doc. 1-1 at 15. An informational, rather than any sanction, issued from the situation. Doc. 25-2. Davi also claims that he was written up because Pechous had told him (though she

denies it) to leave a dog with another inmate to go to therapy.  Doc. 1-1 at 16; Doc. 35 ¶ 36.  Davi believes an informational exists about Pechous trying to take his dog job, but Ponto attested there is no such informational to be found.  Doc. 37 ¶ 3; Doc. 39 ¶ 6.  Prior to Davi's filing of a grievance about his medical care, he was only written up one time.  Doc. 37 ¶ 4.

The fact of the matter is Davi continued to work with dogs until the Covid-19 pandemic caused the Humane Society to suspend the program.  Doc. 26 ¶ 9; Doc. 33 at 7; Doc. 36 ¶ 7.  After Davi was transferred to the Hill where there is better programming and employment opportunities, he continued working with dogs.  Doc. 26 ¶ 25.  See also Doc. 25 at 12.  Disputes between Davi and the Defendants about whether corrections and minor writeups about Davi's conduct while handling Humane Society dogs are not the sort of genuine dispute of material fact necessary to avert summary judgment.  Even if some retaliatory motive existed as to any such correction, a person of ordinary firmness would not be deterred from the protected activity of filing a grievance.  And § 1983 is not a mechanism for an inmate to have a federal court review the merit or lack of merit of corrections or minor writeups.  See Meachum v. Fano, 427 U.S. 215, 229 (1976) (citations omitted) ("The federal courts do not sit to supervise state prisons, the administration of which is acute interest to the States."); Evenstad v. Herberg, 944 F. Supp. 2d 995, 1001 (D. Minn. 2014) ("[T]here are some injuries so de minimis that they do not rise to the level of constitutional violation.").

In February 2021, Davi was called to laundry and asked why he was not coming to work.  Doc. 1-1 at 18.  Davi blames Pechous for not telling him that he was hired in the laundry.  Id.  Regardless, Davi then worked in the laundry unit until his transfer to the Hill and now works there with dogs.  "[S]ome injuries [are] so de minimis that they do not rise to the level of constitutional violation."  Evenstad, 944 F. Supp. 2d at 1001.  Thus, even if Pechous somehow retaliated against

Davi by not informing him of his employment with laundry, he worked at the laundry and now works at his preferred job, so any possible injury does not rise to the level of a constitutional violation.

Davi claims that he was underpaid in March 2020. Doc. 26 ¶ 13. Defendants explained that he was working fewer hours due to Covid-19. Doc. 30 ¶ 27. Davi does not directly dispute this in his response but still asserts retaliation through an underpayment for his additional hours bleaching doors. Doc. 35 ¶ 27. Davi notes that Bieber, not Pechous, hired him to work additional hours as a door bleacher when the Humane Society dogs were not at the SDSP. Doc. 36 ¶ 19. Davi says that Pechous did payroll and believes his underpayment was retaliation. See Doc. 1-1 at 14. Davi then worked in the laundry unit and back with dogs on the Hill. This alleged underpayment occurred within two months of Davi's grievance, and Davi has little ability to refute Defendants' version of facts absent discovery. This Court as stated above will allow Davi to conduct limited discovery on this claim and relating to his employment and discipline history since 2019. Summary judgment on this claim is denied at this time, but may be sought following written discovery.

### 2.    Official Capacity Claims Against Pechous, Sullivan, Ponto, and Cook

Davi bears the burden of establishing that he had standing under Article III of the Constitution to seek injunctive relief. Park v. Forest Serv. of U.S., 205 F.3d 1034, 1036–37 (8th Cir. 2000). To demonstrate standing, Davi must establish in injury in fact; a causal connection between the injury and Defendants' alleged conduct; and a likelihood that the remedy he seeks will redress the alleged injury. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102–03 (1988). When a plaintiff is seeking injunctive relief, "the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." Park, 205 F.3d at 1037.

Evidence that a plaintiff suffered an injury in the past does not alone establish that the plaintiff has standing to seek injunctive relief. O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects").

In City of Los Angeles v. Lyons, the Supreme Court made clear that a plaintiff must show that "the injury or threat of injury" is "real and immediate" to have standing to seek injunctive relief. 461 U.S. 95, 102 (1983). A "conjectural" or "hypothetical" threat of injury does not establish standing. Id. In Lyons, the plaintiff sought injunctive relief barring police officers from using chokeholds unless suspects were threatening the officers with the immediate use of deadly force. Id. at 98. Although Lyons had been subjected to a chokehold in the past and alleged that police officers routinely applied chokeholds when they were not threatened by deadly force, the Supreme Court held these facts fell short of establishing that Lyons faced a real and immediate threat of future harm. Id. at 105–06. Because Lyons did not demonstrate that there was a sufficient likelihood that the police would subject him to a chokehold in the future, he did not have standing to seek injunctive relief. Id. at 105–10. "[A] speculative possibility of future harm is not enough to preserve a live case or controversy under Article III." Brazil v. Ark. Dep't of Human Servs., 892 F.3d 957, 960 (8th Cir. 2018) (citing Ashcroft v. Mattis, 431 U.S. 171, 172 n.2 (1977) (per curiam)).

For Davi's retaliation claim, he requested the following injunctive relief: (1) stop the retaliation by the Department of Corrections, (2) return his job working with dogs, and (3) stop his transfer to the Hill. Doc. 6 at 10. For the reasons explained earlier, there remains no genuine issue of material fact on Davi's retaliation claims other than possible underpayment for his work. Davi has been at the Hill without any apparent safety issue and works with the dogs there now.

24

Defendants are entitled to summary judgment on these claims, but at this time, Defendants are not entitled to summary judgment on Davi's claim for underpayment for his work.

Cook and Sullivan are no longer employed at the SDSP. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Sullivan was the former warden at the SDSP; Teresa Bittinger, the current warden of the SDSP, is automatically substituted under Rule 25(d). Cook was a former associate warden at the SDSP. The Parties do not identify Cook's successor, and Davi's official capacity claims against other Defendants remain to provide injunctive relief. Thus, Davi's claims against Cook in her official capacity are dismissed.

### D.    Deliberate Indifference towards Serious Medical Needs (Claim II)

#### 1.    Individual Capacity Claims Against Dr. Carpenter

Davi sued Dr. Carpenter in her individual capacity for violating his Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs for his right knee. Doc. 6 at 2, 5. Dr. Carpenter moves for summary judgment on Davi's Eighth Amendment deliberate indifference claim against her in her individual capacity.[9] Doc. 25 at 14–27. Defendants argue that "Davi cannot establish that Health Services or Defendants

---

[9] Defendants also move for summary judgment under the doctrine of respondeat superior. Doc. 30 ¶ 128. "Section 1983 will not support a claim based on a *respondeat superior* theory of liability[.]" Polk Cnty. v. Dodson, 454 U.S. 312, 454 (1981). Section 1983 "requires a causal link to, and direct responsibility for, the deprivation of rights." Madewell, 909 F.2d at 1208 (citing Rizzo v. Goode, 423 U.S. 362, 370–71)). In Davi's amended complaint, he alleges that Dr. Carpenter "has to approve all medical tests, proceeders [sic], and medical care[;]" thus, Davi alleged personal involvement through Dr. Carpenter's failure to approve of an MRI. Doc. 6 at 2, 5.

were deliberately indifferent toward Davi's serious medical needs and administered pain medication and treatment appropriately." Id. at 27.

To succeed on a deliberate indifference claim, Davi must show that (1) he suffered "an objectively serious medical need" and (2) that the "defendant[s] actually knew of, but deliberately disregarded, such need." McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (quoting Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2008)). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.' " Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). "[A]ctual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious." Id. at 481–82 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)). "It is sufficient to show that the 'defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it.' " Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015) (quoting Farmer, 511 U.S. at 842). If such knowledge is shown, the plaintiff must also show the defendants " 'knew that their conduct was inappropriate in light of' the risk to the prisoner." Id. (quoting Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)).

The plaintiff's burden to show deliberate indifference is greater than the burden to show negligence. McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012) (citing Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)). The plaintiff must show that the defendant's mental state was "akin to criminal recklessness." Id. (quotation omitted). When evaluating whether a defendant displayed deliberate indifference to a plaintiff's serious medical needs, a court considers the defendant's "actions in light of the information [the defendant] possessed at the time, the practical

limitations of [the defendant's] position[,] and alternative courses of action that would have been apparent to an official in that position." Letterman, 789 F.3d at 862 (quoting Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000)).   Examples of "[d]eliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cnty., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)). "[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Alberson, 458 F.3d at 765).

Here, Defendants allege that "Davi cannot establish that Health Services or Defendants were deliberately indifferent toward Davi's serious medical needs and administered pain medication and treatment appropriately." Doc. 25 at 27.   Defendants assert that "[c]onservative measures were attempted first to alleviate any issue before resorting to surgery, which was recommended by outside providers, and Health Services treated Davi each time he expressed that he was in pain." Id.

Davi alleges that he was not provided an MRI for several years. Doc. 6 at 5.   But the Supreme Court has held that without more, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Estelle, 429 U.S. at 107.   Davi has admitted that although Defendants did not order an MRI for several years, other diagnostic and pain management measures were taken, including providing a radiograph in 2014, an EMG in 2015, and an x-ray and MRI in 2017. Doc. 25-7 at 3; Doc. 25-9; Doc. 25-16; Doc. 25-18; Doc. 27 ¶¶ 8, 10, 16, 19.

Davi alleges that all conservative options were not done before he had knee replacement surgery. Doc. 36 ¶ 31.   Dr. Carpenter did not provide a platelet rich plasma injection as proposed

27

by AMG Orthopedics and Sports Medicine and provided physical therapy prior to his surgery without a recommendation from the surgeon. Id.; Doc. 33 at 18. Following Davi's surgery, he received physical therapy only twice a week instead of three times a week as recommended by his surgeon. Doc. 33 at 20; Doc. 36 ¶¶ 32, 38, 40. "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)). See also Hensley v. Montgomery Cnty., 2006 WL 156733, at *5, 2006 U.S. Dist. LEXIS 2104, at *15 (E.D. Mo. Jan. 20, 2006) ("[E]ven when a prison physician has failed to follow the recommendations of outside specialists, the prison doctor will not be displaying deliberate indifference if the doctor used her independent professional judgment when choosing the particular course of treatment.") (internal citation and quotations omitted)). Davi has alleged a disagreement in medical treatment and does not have a constitutional right to receive a particular or requested course of treatment.

Davi alleges that he was provided inadequate pain control when he was provided Tramadol only three times a day instead of the prescribed four times a day, when he was instructed to wean off the pain medication. Doc. 25-42; Doc. 30 ¶ 108. Davi does not dispute that he was instructed to wean off medication, nor does he dispute that Health Services told him to take four Tramadol a day if his pain was not under control. Doc. 25-42; Doc. 35 ¶ 108. Thus, Davi does not allege that the decrease in Tramadol was deliberate indifference. Even if he did allege it was deliberate indifference, "[i]t has been held that the occasional missed dose of medicine, without more, does not violate the Eighth Amendment." Jordan v. Branham, 2006 WL 407705, at *5 (W.D. Ark. Jan. 25, 2006) (collecting cases).

As of July 12, 2017, a Health Services provider identified that Davi would eventually need a knee replacement but should proceed with conservative treatment at that time.  Doc. 27 ¶ 16 (citing Doc. 25-16 at 5).  Davi claimed that as of November 7, 2017, "[t]here was very little left of Davi's knee that could be damaged[.]"  Doc. 33 at 17.  On November 8, 2017, the provider at AMG Orthopedics and Sports Medicine identified that "[u]ltimately, the only 'fix' for this problem [Davi's knee] is to do a partial knee replacement.  However, conservative management should be initially utilized to help with pain control."  Doc. 25-20 at 4.  Health Services also recommended conservative treatment with injections, Etodolac, and ice to delay surgery as long as possible.  Doc. 25-16 at 5.  Davi argues that Health Services' statement about his knee does not state "lets [sic] find out what is wrong and see if it can be fixed, its [sic], let it keep getting worse until Davi needs his knee replaced[.]"  Doc. 33 at 15.  Thus, even if Dr. Carpenter had approved the knee surgery earlier between 2017 through 2019, Davi would still require knee surgery; Davi alleges that he experienced pain from his knee popping out despite the braces and other conservative and pain management systems utilized.[10]  "[W]here pain or discomfort is the sole effect of a delay in treatment, an inmate fails to state a deliberate indifference claim."  Leggins v. Eggert, 4:12-CV-04139-LLP, 2014 WL 1285786, at *8, 2014 U.S. Dist. LEXIS 40882, at *26–27 (D.S.D. Mar. 27, 2014) (quoting Reed v. Weber, 4:10-CV-04069-KES, 2010 WL 3363402, at *4, 2010 U.S. Dist.

---

[10] Davi's Gabapentin medication was denied after he was noncompliant, but he alleges that he was noncompliant because he was not able to wake up in time to attend morning medical pass.  Doc. 36 ¶ 42.  Davi claims that this medication was for all joint pain, not just his knee; thus, his denial of Gabapentin is not related to his claim for deliberate indifference to treat his knee.  See Doc. 36 ¶ 30.  Davi also alleges that he was prescribed Lyrica, a pain medication, for back, shoulder, neck, and general pain.  Doc. 36 ¶ 42.  Davi was found noncompliant for not taking his morning doses of Lyrica, and his prescription for Lyrica was cancelled.  Doc. 36 ¶ 42.  Even if the Gabapentin and Lyrica did relate to his knee, the Eighth Circuit has held that a defendant was not deliberately indifferent when the prisoner refused to cooperate with the prescribed course of medical care.  See Long, 86 F.3d at 765–66.

LEXIS 86663, at *12 (D.S.D. Aug. 23, 2010)).   Davi has not shown that Defendants were deliberately indifferent by implementing conservative treatment methods prior to surgery.

Davi claimed that Health Services denied him access to a wheelchair when he was having stability issues, but upon talking with Ponto, Davi was provided a wheelchair until his next appointment.   Doc. 35 ¶ 111.   Davi also claimed that when he was returned from the hospital to SDSP he was not transported in a wheelchair accessible van causing him discomfort, but the pain subsided.   Doc. 27 ¶ 40; Doc. 25-39.   Davi alleges negligence that resulted in his pain, not deliberate indifference.   Negligence, even gross negligence, is not actionable as a violation of Eighth Amendment deliberate indifference.   Warren v. Missouri, 995 F.2d 130, 131 (8th Cir. 1993).   After reporting the discomfort to Ponto, Davi was transported in a wheelchair van going forward.   Doc. 36 ¶ 35.

In Davi's affidavit, he alleges that he has been denied other medical care.   Doc. 36 ¶ 29; Doc. 37 at 2.   But Davi's complaint alleges deliberate indifference only for the treatment of his right knee.   Doc. 6 at 5; Doc. 7 at 8.   "A party cannot assert a new theory of his case in defending a summary judgment motion or expand a claim to create a material issue of fact where none existed before."   Woods v. Wills, 400 F. Supp. 2d 1145, 1184–85 (E.D. Mo. 2005) (citing Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 288–89 (8th Cir. 1988)).   Davi has not alleged a claim for deliberate indifference for other medical needs beyond his right knee, and the attention to and care provided for his knee condition does not constitute deliberate indifference.   Therefore, Dr. Carpenter is entitled to summary judgment for Davi's claims against her in her individual capacity.

### 2.   Official Capacity Claims Against Dr. Haynes

Davi sued Dr. Carpenter, the former medical director, in her official capacity for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.   Doc. 6 at

2, 5. Because Dr. Carpenter is no longer employed at the SDSP, Dr. Haynes, the current medical director, was automatically substituted for the claims against Dr. Carpenter in her official capacity. See Fed. R. Civ. P. 25(d). This Court dismissed the official capacity claims for money damages against Defendants during its § 1915A screening of Davi's amended complaint. Doc. 7 at 7, 14. Because there are no genuine issues of material fact on Davi's Eighth Amendment claims, as established in the prior section on Davi's claims against Dr. Carpenter, Dr. Haynes is also entitled to summary judgment against him in his official capacity.

Davi also has not established an injury in fact, with a causal connection between Defendants' conduct and the relief he seeks will redress the alleged injury. Steel Co., 523 U.S. at 102–03. This Court when screening Davi's amended complaint found that Davi did not request injunctive relief for his claims of inadequate medical care in his amended complaint. See Doc. 7 at 7 ("Davi seeks no injunctive relief for his claims of inadequate medical care."). Although Davi did file a letter as an attachment to his original complaint, which requested that medical staff follow outside specialist's medical orders, see Doc. 1-1 at 7, Davi has not shown that granting an order to follow specialists' recommendations over four years after completion of his surgery would redress the alleged injury. Davi in his sworn affidavit in response to Defendants' motion for summary judgment alleges that "there is a need for this court to intervene in the practices of medical treatment that is not being provided" in connection with his other health concerns that were not alleged in his original or amended complaint. Doc. 37 at 2. Because Davi has received the surgery and follow-up care for his knee and did not allege Eighth Amendment claims for other injuries besides his knee, this Court will not now allow Davi to expand his claim when responding to Defendants' motion for summary judgment. See Statler v. Buffalo-Bodega Complex, Inc., 5:06-CV-05033-RHB, 2007 WL 320959, at *4, 2007 U.S. Dist. LEXIS 7198, at *13 (D.S.D. Jan. 30,

2007) ("The Court will not allow the Plaintiffs to enlarge the basis for their claims based on arguments made in response to a motion for summary judgment."). Thus, Dr. Haynes is entitled to summary judgment on Davi's claims against him in his official capacity.

Accordingly, it is

ORDERED that Davi's motion for limited discovery, Doc. 34, is granted in part. While addresses of former officers Bell and Moore need not be provided to Davi, this Court will allow Davi to serve interrogatories and requests for production for him to receive all available information relating to his work and disciplinary history from 2019 forward as well as his wages earned and calculation thereof, and whether any records exist to suggest a retaliatory motive by anyone at SDSP. It is further

ORDERED that Davi's claims against Cook in her official capacity are dismissed. It is finally

ORDERED that Defendants' Motion for Summary Judgment, Doc. 24, is granted in part.

DATED March 29th, 2024.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE